UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REGINA MCDONALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:17-cv-02254-SEB-MJD |
| | ) |
| NANCY A. BERRYHILL, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Regina Loraine McDonald ("McDonald") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3)(A). For the reasons set forth below, the Magistrate Judge recommends that the District Judge **AFFIRM** the decision of the Commissioner.

**I.    Background**

McDonald filed an application for SSI on September 27, 2013, alleging an onset of disability date of May 25, 2008.[1] [Dkt. 14-2 at 18.] McDonald alleges disability due to severe depression and chronic paranoid schizophrenia.[2] [Dkt. 14-3 at 3.] McDonald's application was

---

[1] The Court notes that McDonald filed an application for SSI on October 22, 2013, alleging an onset of disability date of May 25, 2008. [Dkt. 14-5 at 2.] However, the ALJ stated in his decision that McDonald filed an application for SSI on September 27, 2013. [Dkt. 14-2 at 18.] The parties do not dispute this discrepancy but rather follow the ALJ's footstep and state in their briefs that the application date was September 27, 2013. [*See* Dkt. 18 at 1; Dkt. 19 at 1.] Because this is not a material fact that would affect the Court's analysis, the Court assumes that McDonald filed her application for SSI on September 27, 2013.
[2] McDonald and the Commissioner recited the relevant factual and medical background in more detail in their opening briefs. [*See* Dkt. 18; Dkt. 19.] Because these facts involved McDonald's confidential and otherwise

1

initially denied on December 2, 2013, and denied again on February 25, 2014, upon reconsideration. [Dkt. 14-4 at 2-17.] McDonald timely filed for a written request for a hearing, which was held on May 5, 2015, before Administrative Law Judge David J. Begley ("ALJ"). [Dkt. 14-2 at 32-52.] The ALJ issued a decision on September 25, 2015, again denying McDonald's application for SSI. [Dkt. 14-2 at 15-28.] On May 12, 2017, the Appeals Council denied McDonald's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. [Dkt. 13-2 at 2.] McDonald timely filed her Complaint with this Court on June 30, 2017, which Complaint is now before the Court. [Dkt. 1.]

## II.     Legal Standard

To be eligible for DIB or SSI, a claimant must have a disability pursuant to 42 U.S.C. § 423.[3] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a five-step sequential analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is

---

sensitive medical information, the Court will incorporate by reference the factual background in the parties' briefs but will articulate specific facts as needed below.

[3] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for Disability Insurance Benefits and Supplemental Security Income claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provisions as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

disabled; (4) if the claimant is not found to be disabled at step three and she is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three and cannot perform her past relevant work but she can perform certain other available work, she is not disabled. 20 C.F.R. § 404.1520. Before proceeding from step three to step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), identifying the claimant's functional limitations and assessing the claimant's remaining capacity for work-related activities. S.S.R. 96-8p.

The ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This Court may not reweigh the evidence or substitute its judgment for that of the ALJ but may only determine whether substantial evidence supports the ALJ's conclusion. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008) (citing *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into his reasoning" and "build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

### III.     The ALJ's Decision

The ALJ first determined that McDonald has not engaged in substantial gainful activity since September 27, 2013, the application date. [Dkt. 14-2 at 20.] At step two, the ALJ determined that McDonald has "the following severe impairments: depression and paranoid schizophrenia." [Dkt. 14-2 at 20.] However, at step three, the ALJ found that McDonald does not have an impairment or combination of impairments that meets or medically equals a listed impairment. [*Id.*] In making this determination, the ALJ considered Listings 12.03 (Schizophrenia spectrum and other psychotic disorders) and 12.04 (Depressive, bipolar and related disorders). [Dkt. 14-2 at 20-22.]

The ALJ next analyzed McDonald's residual functional capacity ("RFC"). He concluded that McDonald had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> [A]void hazardous machinery, unprotected heights, and open flames; work is limited to simple, routine, and repetitive tasks; work environment free of fast paced production requirements, involving only simple, work related decisions with few, if any, workplace changes; occasional interaction with coworkers, supervisors, and the general public.

[Dkt. 14-2 at 23.] In finding these limitations, the ALJ considered all of McDonald's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [*Id.*] At step four, the ALJ concluded that McDonald is unable to perform any past relevant work. [Dkt. 14-2 at 26.] The ALJ proceeded to step five, at which time he received testimony from a vocational expert indicating that someone with McDonald's education, work experience, age, and RFC would be able to perform unskilled medium occupations such as a cleaner and unskilled light occupations such as an officer helper

and chamber maid. [*Id.* at 27.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded that McDonald was not disabled. [*Id.* at 27-28.]

### IV. <u>Discussion</u>

McDonald asserts the ALJ committed two errors that require remand: (1) the ALJ erred in his analysis of the medical opinions; and (2) the ALJ failed to define "fast-paced production requirement" for the vocational expert ("VE").

#### A. Weight of Medical Opinions

McDonald first challenges the weight assigned by the ALJ to the medical opinions in the record. The Court addresses each argument relating to the ALJ's weight of medical opinions in turn below.

##### 1. *Dr. Salama*

In December 2012, psychiatrist Dr. Mary Salama began treating McDonald for schizophrenia. [Dkt. 14-14 at 4.] In the clinical notes prepared in August 2014, December 2014, and March 2015, Dr. Salama consistently stated that during her visits, McDonald was cooperative and pleasant, her grooming and hygiene were fair, and her affect was either flat or restricted. [Dkt. 14-13 at 21, 28, 35.] Dr. Salama noted that McDonald repeatedly denied hallucinations or delusions. [*Id*.] Dr. Salama further noted that McDonald denied any other manic depressive or psychotic symptoms. [*Id*.]

On May 15, 2015, Dr. Salama completed a function report concerning schizophrenia. [Dkt. 14-14 at 4.] Dr. Salama assigned McDonald a GAF of 50-55. [*Id*.] She checked the provided boxes indicating McDonald had the following symptoms that were either intermittent or persistent: delusions or hallucinations; catatonic or other grossly disorganized behavior; incoherence or loosening of associations, illogical thinking, or poverty of content of speech

5

associated with one of the following: blunt affect, flat affect or inappropriate affect; and emotional withdrawal and/or isolation. [*Id*.] She opined that McDonald had mild restriction in activities of daily living, moderate difficulty in maintaining social functioning, and marked deficiencies of concentration, persistence or pace. [*Id*.] Dr. Salama also opined that McDonald was not able to work eight (8) hours a day, five (5) days a week and that she would be absent from work about two (2) days per month as a result of her impairments or treatments. [*Id.*] The ALJ assigned "little weight" to the opinion of Dr. Salama because Dr. Salama's opinion was "inconsistent with the objective medical evidence of record." [Dkt. 14-2 at 25.]

McDonald argues that the ALJ did not give "good reasons" or legally sufficient reasons for rejecting Dr. Salama's May 2015 opinions. Typically, the opinion of a treating source on "the nature and severity of a medical condition is entitled to controlling weight if supported by medical findings and consistent with substantial evidence in the record." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(d)(2). However, the opinion of a treating source "is not the final word on a claimant's disability." *Schmidt,* 496 F.3d at 842 (internal quotations and citations omitted). The Seventh Circuit has recognized that, while a treating physician has the advantage over other physicians because they have spent more time with the claimant, many physicians will "bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006.) Therefore, "the weight properly given to testimony or other evidence of a treating physician depends on circumstances." *Id.* Accordingly, the ALJ may discount a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he

6

minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt,* 496 F.3d at 842.

Here, the ALJ more than minimally articulated his reasons for rejecting Dr. Salama's opinion that McDonald could not work eight hours a day, five days per week, and would likely be absent from work two days per month. The ALJ found that Dr. Salama's opinion was not consistent with the objective medical evidence in the record. [Dkt. 14-2 at 25.] Specifically, the ALJ found that the medical evidence demonstrated that McDonald was relatively stable on her medication. [*Id.*] McDonald argues that evidence that a claimant's condition was stable is not proof of the lack of severity of that condition, but rather is evidence that the claimant's condition was fixed at its level of severity. [Dkt. 18 at 11.] This argument is without merit.

As the Commissioner correctly pointed out, McDonald takes the word "stability" out of context from the treatment notes that the ALJ cited in his RFC findings. [Dkt. 19 at 12.] Contrary to McDonald's argument, the treatment notes showed that McDonald's conditions were improved at the time of her discharge from the hospital on September 13, 2013, and remained stable during the following months after the discharge. [Dkt. 14-8; Dkt. 14-13.] In September 2013, upon McDonald's admission to the hospital, the doctor initially noted that McDonald had extremely poor hygiene including not showering and brushing teeth and wearing same outfit for months. [Dkt. 14-8 at 4-6.] The doctor also noted that McDonald spent most of her days sitting on her chair staring straight ahead and barely talked or moved. [*Id.*] The doctor gave her psychotropic medications to **stabilize** her condition. [*Id.*] The doctor also provided her the availability of group support, recreational, music, and occupational therapy. [*Id.* at 6.] At the time of her discharge, McDonald's symptoms had improved and she was in good condition with good sleeps, appetite, and energy. [*Id.*]

McDonald's conditions remained stable in the following months. In particular, in October 2013, during her office visits for temporary outpatient commitment, McDonald reported that the medication had helped her "a lot," that she felt better and thoughts were "less confusing." [Dkt. 14-13 at 2.] Her family also reported McDonald was more alert, oriented, and energetic. [*Id.*] The doctor noted that McDonald was cooperative, engaged, and had good hygiene. [*Id.*] The doctor further noted that McDonald presented with good eye contact, sequential thought processing, soft speech, and her insight and judgment were improving. [*Id.*] The doctor thus decided that there was no need to pursue regular commitment and terminated McDonald's temporary outpatient commitment. [*Id.*]

In January 2014, during one office visit, the doctor similarly noted that McDonald presented with good mood and pleasant affect, good hygiene and grooming. [Dkt. 14-13 at 9.] McDonald also reported that the medication had helped her "significantly," that she felt better and thoughts were "less confusing." [*Id.*] She denied paranoia and delusions. [*Id.*] In August 2014, during another office visit, the doctor again noted that McDonald presented with fair groom and hygiene, flat affect, okay mood, clear speech and good eye contact. [Dkt. 14-13 at 22.] The doctor further noted that McDonald was struggling with low energy and motivation. [*Id.*] However, she was cooperative and engaged and she denied any thoughts of harm to herself or others. [*Id.*] Thus, the objective medical evidence in the record shows that McDonald's symptoms were improved at the time of her discharge from the hospital on September 13, 2013, and remained stable during the following months after the discharge.

Interestingly, in the clinical notes prepared in August 2014, December 2014, and March 2015, Dr. Salama even stated that during her visits, McDonald was cooperative and pleasant, her grooming and hygiene were fair, and her affect was either flat or restricted. [Dkt. 14-13 at 21, 28,

8

35.] Dr. Salama noted that McDonald repeatedly denied hallucinations or delusions. [*Id.*] She also noted that McDonald denied any other manic depressive or psychotic symptoms. [*Id.*] Yet, in the function report concerning schizophrenia completed on May 15, 2015, Dr. Salama opined that McDonald experienced delusions or hallucinations; catatonic or other grossly disorganized behavior; incoherence or loosening of associations, illogical thinking, or poverty of content of speech associated with one of the following: blunt effect, flat effect or inappropriate affect; and emotional withdrawal and/or isolation. [Dkt. 14-14 at 4.] As a result, the ALJ properly gave Dr. Salama's May 2015 opinion "little weight" because it is inconsistent with the entirety of the medical record and Dr. Salama's own treatment notes. *See Hofslien v. Barnhart*, 439 F. 3d 375, 376 (7th Cir. 2006) ("[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.").

In addition, the ALJ stated that another reason why he gave Dr. Salama's March 2015 opinion "little weight" was because "[a]t the consultative examinations, [McDonald] consistently had an appropriate effect." [Dkt. 14-2 at 25.] The ALJ cited to Dr. Kimberly J. Moran's consultative examinations to support his position. [*Id.*] In April 2013, Dr. Moran reported that "[McDonald's] mood was anxious, somewhat depressed and her affect was congruent but her affect was also blunted at times." [Dkt. 14-7 at 4.] In November 2013, Dr. Moran made the same findings. [Dkt. 14-11 at 42.] McDonald argues that the ALJ "grossly misstated" Dr. Moran's findings and that the ALJ did not understand what a "congruent" affect is. [Dkt. 18 at 10.] This argument is unpersuasive. It is appropriate for one's affect to be congruent—one's affect should match her mood rather than contrast her mood.[4] The Court notes that while McDonald argues

---

[4] *See* Mabbett, P.D., *Delmar's Instant Nursing Assessment: Mental Health*, Delmar Publishers (1996), http://www.delmarlearning.com/companions/content/0766826899/res/mentstatexam.asp ("Affect is the visible reaction a person displays toward events. Mood is the underlying feeling state…Incongruent affect, in which the client's expression is of feelings opposite the ones appropriate for the context."); *Mental Status Examination I:*

9

that the ALJ did not understand what a "congruent" affect is, it is McDonald who seems to not understand the meaning of the word. McDonald provides no facts or alternative definitions to support her argument that a congruent affect is not an appropriate affect. [*See* Dkt. 18.] Nonetheless, McDonald's affect was only one of the reasons why the ALJ gave Dr. Salama's March 2015 opinion "little weight." [Dkt. 14-2.] As stated above, the ALJ more than minimally articulated his reasons for reducing the weight of Dr. Salama's March 2015 opinion. Thus, any alleged error about the "true" meaning of "congruent" affect is no more than harmless error. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

McDonald next argues that the ALJ failed to recognize that Dr. Salama was a treating specialist and while acknowledging that Dr. Salama was a treating physician, the ALJ failed to evaluate Dr. Salama's longitudinal perspective. These arguments are equally without merit. Although the ALJ did not specifically referred to Dr. Salama as McDonald's treating psychiatrist, a careful reading of the records suggests that the ALJ was aware of Dr. Salama's treating relationship with McDonald and that she treated McDonald's mental impairments. [Dkt. 14-2 at 25–26.] Thus, it is obvious that the ALJ applied the correct standard when evaluating Dr. Salama's March 2015 opinion.

---

*Definitions of Some Mental Status Examination Findings*, COLUM. UNIV. (2004), http://www.columbia.edu/itc/hs/medical/psychmed/1_2004/mental_status_exam.pdf (defines "blunted" affect as "decrease in amplitude of emotional expression"; defines "inappropriate" affect as "emotions expressed are not congruent with content of patient's thoughts").

10

## 2. *Dr. Moran*[5]

McDonald next argues that the ALJ erroneously evaluated Dr. Kimberly J. Moran's opinion. Generally, an ALJ must reasonably evaluate the opinion of an examining source such as an agency examining psychologist. *See* 20 C.F.R. § 416.927(c). An ALJ must assign a medical opinion appropriate weight after considering relevant factors, including whether the opinion was supported by relevant evidence, whether the opinion was consistent with the record as a whole, and whether the medical source is familiar with other information in the claimant's case record. 20 C.F.R. § 404.1527(c). An ALJ only needs to "minimally articulate" his reasons for the weight he assigned to a medical opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ "minimally articulated" his reasons – a very deferential standard that we have, in fact, deemed 'lax.'").

Dr. Moran examined McDonald twice, once in April 2013 and again in November 2013. [Dkt. 14-7; Dkt. 14-11.] On April 5, 2013, in the first examination, Dr. Moran diagnosed McDonald with moderate depressive disorder and assigned McDonald a global assessment of functioning ("GAF") of 58. [Dkt. 14-7 at 6.] She opined that McDonald would be able to manage her personal funds and would not require assistance with such decisions. [*Id.*] On November 15, 2013, Dr. Moran examined McDonald a second time. [Dkt. 14-11 at 40–46.] Dr. Moran similarly diagnosed McDonald with major depressive disorder and moderate schizophrenia. [Dkt. 14-11 at 44.] She gave McDonald a GAF of 55. [*Id.*] She noted that McDonald performed some cooking and cleaning, but occasionally had to be reminded to perform tasks because McDonald did not feel like doing them. The ALJ gave Dr. Moran's opinion "some weight" because it was

---

[5] The ALJ mistakenly referred to Dr. Moran as "Dr. Morgan." [Dkt. 14-2 at 25.] This is a harmless error as it does not affect the Court's analysis of this case in any way.

11

"somewhat consistent with the objective medical evidence of record." [Dkt. 14-2 at 25.] For example, the ALJ cited records in which McDonald consistently denied any hallucinations or other symptoms of psychosis and medical records showing her symptoms stabilized following consistent medication. [Dkt. 14-2 at 25.]

Additionally, although McDonald recites the proper standard for evaluating examining physicians' opinions, her arguments relating to the facts of this case are, at best, skeletal. McDonald contends that the ALJ erroneously stated that Dr. Moran examined her in 2014; while in fact, Dr. Moran examined her in 2013. She further contends that the ALJ erroneously relied on Dr. Moran's now-obsolete GAF ratings and that the ALJ erred when he gave "some weight" to Dr. Moran opinions even though Dr. Moran did not diagnosed McDonald with schizophrenia in her first examination. These arguments are nonsensical. McDonald fails to identify the authority that states an ALJ may not consider GAF scores at all and what harm, if any, the ALJ caused McDonald when he incorrectly stated that Dr. Moran examined McDonald in 2014 instead of 2013. Similarly, McDonald fails to identify specific evidence to support her argument that the ALJ erred when he assigned Dr. Moran's opinions "some weight" even though Dr. Moran did not diagnose McDonald with schizophrenia in her first examination. The Seventh Circuit has held that "undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1992). Because McDonald offered no more than a "skeletal argument" stating that the ALJ improperly weighed the opinions of an examining medical source, her arguments are waived. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim.").

### B. "Fast-Paced Production Requirement"

McDonald next argues that the ALJ erred by failing to define "fast-paced production requirement" when he asked the vocational expert ("VE") to identify jobs that exist "in a work environment free of fast-paced production requirement." Citing *Varga v. Colvin*, 794 F. 3d 809 (7th Cir. 2015). McDonald contends that by failing to define "fast-paced production requirement," the ALJ committed reversible error.

In *Varga*, the court faced the question of whether the ALJ's hypothetical question to the VE was flawed because it failed to account for all of the plaintiff's mental limitations—namely the "moderate difficulties" in the areas of concentration, persistence, or pace. *Varga*, 794 F.3d at 813. The Commissioner argued that the hypothetical, which included the limitations "free of fast paced production requirements, involving only simple work related decisions with few if any work place [sic] changes and no more than occasional interaction with coworkers or supervisors," adequately account for all of Varga's difficulties maintaining concentration, persistence, or pace. *Id.* at 814. The Court disagreed and reasoned that "'[f]ew if any work place changes' with limited 'interaction with coworkers or supervisors' deals largely with workplace adaptation, rather than concentration, pace, or persistence." *Id.* at 815. The Court went on and noted that "[i]t is also problematic that the ALJ failed to define 'fast paced production.' Without such a definition, it would have been impossible for the VE to assess whether a person with Varga's limitations could maintain the pace proposed." *Id.*

Here, the ALJ posed the following hypothetical to the VE:

> [A] person of claimant's age, education, and work experience. There's no exertional limitations. Would need to avoid hazardous machinery, unprotected heights, and open flames. Further limited to work that's simple, routine, and repetitive tasks in a work environment free of fast-paced production requirement. It would involve only simple, work-related decisions. Few if any workplace

13

> changes. Would have only occasional interaction with coworkers and supervisors and only occasional interaction with the general public.

[Dkt. 14-2 at 48.] Unlike the plaintiff in *Varga*, McDonald does not argue that the hypothetical posed to the VE failed to account for all of her mental limitations, particularly in the areas of concentration, persistence, or pace. [*See* Dkt. 18.] Instead, McDonald only argues that the ALJ committed reversible error because he failed to define "fast-paced production requirement." [Dkt. 18 at 16.] However, the *Varga* court did not hold that "fast paced production" is *per se* vague nor that a definition is always required. *Varga*, 794 F.3d at 813–15. In fact, *Varga* addressed a completely different issue: whether the ALJ's hypothetical question to the VE was flawed because it failed to account for all of the plaintiff's mental limitations—namely the "moderate difficulties" in the areas of concentration, persistence, or pace. *Id.* at 813.

In addition, the Court notes that the *Varga* court stated that it was problematic that the ALJ failed to define "fast paced production" because "[w]ithout such a definition, it would have been impossible for the VE to assess whether a person with Varga's limitations could maintain the pace proposed." *Id.* at 815. In *Varga*, there was no evidence that the VE had reviewed Varga's medical history or heard testimony regarding medical limitations Varga argued were missing from the hypothetical question. *See Id.* at 812. In contrast, the VE in this case had reviewed McDonald's files and heard her testimony. [Dkt. 14-2 at 48.] As a result, even without a definition of "fast-paced production requirement," the VE would still able to assess whether a person with McDonald's limitations could maintain the pace proposed.

### V.  Conclusion

The standard of review of the Commissioner's denial of benefits is deferential. The Court reviews the record as a whole, but does not re-weigh the evidence or substitute its judgment for the ALJ's. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The Court must uphold a decision

where, as here, it is supported by substantial evidence in the record. As the Court cannot find a legal basis to overturn the ALJ's determination that Dean does not qualify for disability benefits, the undersigned recommends the Commissioner's decision be **AFFIRMED**.

### Notice Regarding Exceptions

Within fourteen days of being served with a copy of this report and recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the report and recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection might result in forfeiture of the right to *de novo* determination by a district judge and to review by the court of appeals of any portion of the report and recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.*, 577 F.3d 752, 761 n.7 (7th Cir. 2009); *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Davis v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

Dated:  4 APR 2018

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

J. Frank Hanley, II
LAW OFFICES OF J. FRANK HANLEY II, INC.
jfrankhanley@jfrankhanley.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
jill.julian@usdoj.gov